**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff | ) |
| | ) Criminal Action No. 07-19-JFF |
| v. | ) |
| | ) |
| MARIO WOODING, | ) |
| | ) |
| Defendant | ) |

**GOVERNMENT'S PROPOSED
STATEMENT OF FACTS AND CONCLUSIONS OF LAW**

<u>Statement of Facts</u>

On January 8, 2007, at approximately 8:15 A.M., Emergency Medical Technicians Donald

Moore ("EMT Moore") and Christopher Ginn ("EMT Ginn") responded to a 911 call requesting

emergency, medical aid at 320 East 10th Street, Wilmington, DE.  Suppression Hearing Transcript

("T.") 6-7. EMT Moore is a nationally registered emergency medical technician with twelve years of

experience as an EMT.  T.6.  EMT Ginn was the EMT shift supervisor.  T.6.   To ensure that there

was an actual medical emergency, to provide the EMTs with a safe working environment, and

pursuant to standard Police Department procedure, Wilmington Police Officer Daniel Burton

("Officer Burton"), in police uniform, also responded.  T.7-9.  The caller did not describe the nature

of the emergency or provide the name of the injured person.  T.6.  At 8:21 AM the EMTs and

Officer Burton arrived simultaneously at 320 East 10th Street.  T.7, 9.  The EMTs and Officer Burton

did not know the nature of the medical emergency or the injured person's name when they

responded.  T.19, 26-28, 47.  The EMTs approached the door and found a thirty to thirty-five year

old woman waiting there. T.9-10. She immediately opened the door for the EMTs and Officer Burton. T.9-10. The woman only told the EMTs that "he" was upstairs. T.9-10. The EMTs proceeded upstairs, where a second woman, approximately twenty year old, directed them to the front bedroom. T.11. Neither of the two women identified herself or her relationship with the Defendant. T.10-11, 15, 46, 49-50. Then the EMTs entered the front bedroom, where they found Mario Wooding ("the Defendant"), 20 years old, lying on the floor. T.11, 57. Officer Burton followed along behind the EMTs. T.10. Officer Burton assumed that the 20 year old woman was the Defendant's girlfriend. T. 49, 77. Except for the Defendant, the piece of foam on which the Defendant was lying, the sheets covering the Defendant, a pair of jeans lying right next to the piece of foam, and a pair of work boots within a couple of feet of the jeans, the bedroom was empty. T.11-14, 20. The Defendant was only wearing boxers and a t-shirt. T.13, 48.

   The EMTs administered medical aid to the Defendant, while Officer Burton stood off to the side saying and doing nothing. T.14-16, 18. The EMTs asked the Defendant his name and received no response. T.14-15. They assessed the Defendant's vital signs and mental state. T.14. The EMTs determined that the Defendant was in a postictal state[1], a condition which follows a seizure. T.14-15. The EMTs further determined that in order to provide proper emergency care they needed to learn the Defendant's name and medical history. T.15, 17-18. The Defendant's girlfriend was standing nearby, and the EMTs asked her if she knew anything about the Defendant's medical history, or the Defendant's name, but the Defendant's girlfriend gave no response of any kind. T.15,

_____

[1]Seizure victims often enter a postictal state. T.14. In a postictal state, lack of oxygen to the brain alters an individual's mental status. T.14-15. Although the individual's eyes may be open, he is unaware of his surroundings, does not comprehend attempts to communicate with him, and is unresponsive to questions and commands. T.14-15.

27-28. Attempting to assist the EMTs, Officer Burton then also asked the Defendant's girlfriend for the Defendant's name, but she again gave no answer. T.49. (Unknown to the EMTs and Officer Burton, the Defendant's girlfriend did not know the Defendant's last name. T.84.) After having received no information about the Defendant's identity or medical history from the two women or any of the residence's other occupants, EMT Moore started searching the room for an identification card of the Defendant or some medical card which would identify certain chronic conditions such as epilepsy and heart problems. The EMTs needed such identification and medical history to properly treat the Defendant and to relay the information to any hospital staff that might later treat the Defendant in the event he was transported to a hospital by the EMTs. T.15-20. While EMT Moore conducted his search for identification and medical history, EMT Ginn continued to attend to the Defendant, placing him on oxygen, as a postictal state is caused by lack of oxygen. T.15-20.

EMT Moore first examined the jeans lying nearby, in which he did not find any identification. T.15-16. EMT Moore then noticed a cell phone antenna sticking out of the top of one of the work boots. T.16. Reasoning that this antenna indicated that the Defendant kept personal items in the boots that could be helpful in identifying the Defendant or his medical history, EMT Moore examined the boots. T.16-20. EMT Moore first looked inside the boot containing the cell phone, and discovered a handgun. T.16. EMT Moore then alerted Office Burton to the presence of a gun. T.16, 18, 50. EMT Moore then emptied the boot out onto the foam mattress. T.16. The gun fell out, and EMT Moore picked up the gun, disarmed it, and placed it on the foam mattress. T.17. In a continued effort to discover the Defendant's name and medical history, EMT Moore proceeded to empty out the other work boot, out of which nineteen bags of heroin fell. T.20. At no time prior to the conclusion of EMT Moore's search of the pants and boots was he aware of the Defendant's

3

identity or medical history. T.12, 14-15, 19. Throughout EMT Moore's search of the clothing,
Officer Burton did not give any directions, nor did EMT Moore request of the officer any directions.
T.18, 51. Officer Burton then took possession of the handgun and the heroin. T.20, 50-51. Up until
that point, Officer Burton had stood nearby watching what was transpiring and ensuring that the
EMTs had a safe environment in which to work. T.7-9, 18, 51.

During EMT Moore's search for the Defendant's identification and medical history, the
Defendant's girlfriend left the front bedroom area, telephoned the Defendant's mother, and asked her
for the Defendant's last name. T.19, 21, 78. The Defendant's mother told the girlfriend the
Defendant's last name, and explained that the Defendant had been to a hospital the previous
evening. T.19, 21-22, 80, 84. After the handgun and drugs were discovered by EMT Moore, the
Defendant's girlfriend conveyed this information to EMT Ginn. T. 22, 32-33, 78. After Officer
Burton, in turn, learned the Defendant's name, Officer Burton discovered that there were three
outstanding warrants for the Defendant's arrest. T.51.

After being administered oxygen by the EMTs, the Defendant emerged from his non-
responsive, postictal state. T.22. The Defendant told the EMTs that, as a result of abusing cough
syrup to get high, he had a seizure the previous evening and went to a hospital, and that the doctors
there discharged him that same evening after informing him that he was having seizures due to his
abuse of cough syrup and that the seizures could continue until the syrup was out of his system.[2]
T.22. The Defendant further told the EMTs that he did not want to be transported to the hospital.

_____

[2]The Defendant's mother testified that on January 7, 2007, at approximately 11:30-11:45
P.M., she took the Defendant to St. Francis Hospital because he complained of a migraine
headache. T.73-74. The hospital records indicate that the reason for visit was "C/O [complained
of] HEADACHE" and that the Defendant reported "blackout last week after mixing [illegal
prescription drugs.] Defense Exhibit 2.

4

T.22.  The EMTs then determined that the Defendant was conscious, alert, and oriented times four.[3]

T.22-23.  The EMTs examined the Defendant and found him fully alert to his surroundings, his

identity, the events taking place around him, and his medical condition.  T.22-23.  The EMTs

determined that the Defendant was competent to refuse medical care.  T.23-24.  At 8:47 A.M., the

EMTs cleared the scene.  T.24.  Officer Burton remained behind.  T.24, 52.

At approximately 8:50 A.M., after taking possession of the heroin and firearm, Officer Burton

informed the Defendant that he was under arrest for the three outstanding warrants, took him into

custody and placed the Defendant in the officer's patrol car outside 320 East 10th Street.  T. 52-53,

61.  The Defendant was calm.  T.52.  As Officer Burton was taking the Defendant to the patrol car,

the Defendant's mother appeared.  T. 58-59.  Officer Burton waited for one minute at the curb to let

the Defendant's mother speak to the Defendant before the officer transported him to the police

station at 4th Street and Walnut Street, Wilmington, DE.  T.52-53, 58-59.  The transport took less

than 5 minutes.  T. 53.  Officer Burton and the Defendant arrived at the police station at

approximately 9:00 A.M., ten to fifteen minutes after the EMTs left 320 East 10th Street.  T.52-53.

A few minutes after 9:00 A.M., Officer Burton placed the Defendant in an interview room, read the

Defendant his *Miranda* Rights verbatim from a card[4], and asked the Defendant if he wanted to talk

---

[3]The EMTs found that the Defendant was CAAO (conscious, alert, and oriented) times
four: "Conscious, alert and oriented times four, he knows who he is, he knows where he is and he
knows when it is and he is aware of his situation."  T.22.

[4]The card (Government Exhibit 1) reads as follows:
    1.  You have the right to remain silent.
    2.  If you give up that right to remain silent, anything that you say can be used
against you in a court of law.
    3.  You have the right to talk to a lawyer before any questioning and to have an
attorney with you during any questioning.
    4.  If you cannot afford an attorney, the court will appoint an attorney for you free

about what happened. T.53-55, 61. When Officer Burton informed the Defendant of his *Miranda* Rights, the Defendant was attentive, alert, appeared to understand his rights, and did not ask for any rephrasing of or explanation of those Rights. T.54-57. When asked by Officer Burton, the Defendant voluntarily stated that he was prepared to answer Officer Burton's questions. T.55.

Within minutes of waiving his Miranda Rights, the Defendant said that the drugs were his and he sells them, and that the gun was his and he uses it for protection. T.55. Throughout the Defendant's brief interview with Officer Burton there was no language barrier, the Defendant never expressed any mental or physical discomfort, never indicated that he did not understand Officer Burton, never asked to have any question rephrased or repeated, never stated that he was confused, and never appeared to be confused. T.54, 56-57. No one made any promises or inducements to the Defendant to encourage him to confess, nor did anyone coerce him in any way. T.57. Once the EMTs had cleared the Defendant, he was very coherent and never hesitated to answer any questions. T.57.

This was not the Defendant's first arrest. His rap sheet reflects 7 previous arrests, for charges including burglary, conspiracy, possession with intent to deliver a Schedule I narcotic, carrying a concealed deadly weapon, and resisting arrest. Government Exhibit 4 ("Gov. Ex. 4").

## Conclusions of Law

### The Entry of the Residence

---

of charge.
5. If you start answering questions, you may stop answering questions at any time.
6. Do you understand these rights that I have just explained to you?
7. Do you voluntarily waive these rights?
8. Are you willing to voluntarily answer my questions?

Third party consent to entry is valid so long as that person has "common authority over or other sufficient relationship to the premises." *United States v. Matlock*, 415 U.S. 164, 171 (1974). As long as officers have a "reasonable belief" that the third party has the authority necessary to consent, the entry is valid. *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990). The appropriate standard is whether "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises[.]" *Id.* at 188 (citations omitted).

There is no Fourth Amendment prohibition on police officers and other government employees entering a home when probable cause *and* exigent circumstances exist. *United States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006). Police may make a warrantless entry into a premises to aid emergency medical personnel perform their duties. *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1244 (7th Cir. 1994).

The entry into the residence was permissible and did not violate the Fourth Amendment. In the present case, there was consent from a person with apparent authority over the premises. The woman who greeted the EMTs and the officer acted as if she had authority over the premises by admitting them and directing them to the location of the Defendant. The Defendant's girlfriend reaffirmed that consent by directing the EMTs and officer to the front bedroom. Neither woman objected to Officer Burton's presence. Because the EMTs and Officer Burton entered 320 East 10th Street with the consent of an adult with the sufficient apparent authority to consent, the entry into the residence and into the bedroom was proper and did not violate the Fourth Amendment.

Furthermore, the EMTs and Officer Burton entered a home in response to an 911 call reporting an unknown medical emergency. They only entered those areas of the house necessary to providing that emergency, medical care. Because they entered under a reasonable belief that there was someone within who required immediate medical care, their entry into the residence and the

7

bedroom was proper and did not violate the Fourth Amendment.

**The Search of the Jeans and Boots**

"[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey v. Arizona,* 437 U.S. 385, 392 (1978).  Medical personnel can conduct searches, which would otherwise violate the Fourth Amendment, when they reasonably believe the search critical to the patient's care. *United States v. Mayes,* 670 F.2d 126, 128 (9th Cir 1982).  Even police can search a closed container, when they do so in the reasonable belief that the search is critical to saving the patient's life. *United States v. Dunavan,* 485 F.2d 201, 203-04 (6th Cir. 1973).

The permissible extent of a search justified by emergency is dictated by the particular emergency at hand. *Mincey,* 437 U.S. at 393.

The search of the jeans and the boots was proper and did not violate the Fourth Amendment. EMT Moore only conducted the search after asking the other individuals present in the residence for the Defendant's name and medical history, and receiving no response.  The logical inference from the Defendant wearing only boxers and a t-shirt, and a pair of jeans and a pair of work boots lying nearby was that the jeans and work boots belonged to the Defendant.  Given that the room was empty except for the jeans and boots, EMT Moore's judgment that those were the items most likely to contain information on the Defendant's identity or medical history was reasonable.  EMT Moore then proceeded to search the items in a logical order (first the jeans, then the boot with the cell phone antenna sticking out of it, then the other boot).  That EMT Moore searched the items in an order logically directed to finding the Defendant's identity and medical history as quickly as possible strongly suggests that the only goal of the search was to provide emergency, medical care to the

8

Defendant. Likewise, that Officer Burton only asked the Defendant's girlfriend for the Defendant's name after the EMTs had received no response makes clear that Officer Burton's inquiry was directed towards the Defendant's emergency care and not towards law enforcement.

EMT Moore's search was closely tailored to the emergency at hand. EMT Moore only conducted this very limited and closely tailored search when it proved necessary for proper emergency, medical care, and only after the two EMTs had exhausted the available, less intrusive means. The search of the jeans and boots did not, therefore, violate the Fourth Amendment, and, thus, the Court should not suppress the evidence thereby discovered.

### The Miranda Waiver

A waiver of *Miranda* Rights must be both: (a) voluntary; and (b) knowing and intelligent. The waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citing *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). A waiver of *Miranda* Rights must have been knowing and intelligent in the sense that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

Where there is nothing in the record indicating that "police resorted to physical or psychological pressures to elicit the statements," a *Miranda* waiver is voluntary. *Id.* A voluntariness inquiry in a *Miranda* waiver context requires no more than a voluntariness inquiry in a confession context. *Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986). "The sole concern of the Fifth Amendment, on which *Miranda* is based, is governmental coercion. ... The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." Id. at 170 (citations omitted).

The "totality of the circumstances" determines whether a *Miranda* Waiver was made knowingly, intelligently, and voluntarily. *Moran*, 475 U.S. at 421; *United States v. Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989). Prior experience with the criminal justice system suggests that a defendant waived his *Miranda* Rights knowingly and intelligently. *United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005).

An express oral waiver of *Miranda* Rights is strong proof of that waiver's validity. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

The government bears the burden of proving the validity of a *Miranda* waiver by a preponderance of the evidence. *Connelly*, 479 U.S. at 169; *Missouri v. Seibert*, 542 U.S. 600, 609 n.1 (2004) (citations omitted).

Officer Burton properly read the Defendant his *Miranda* Rights, which the Defendant then voluntarily, knowingly, and intelligently waived. That the Defendant's waiver was express is strong proof of his waiver's validity. The EMTs's evaluation that the Defendant was alert and oriented must receive considerable weight given that it is an objective, professional medical opinion formed nearly contemporaneous to the Defendant's *Miranda* waiver. The EMTs had further determined that the Defendant was competent to make the important decision to refuse medical care.

During the period surrounding the Defendant's *Miranda* Waiver, Officer Burton never observed anything about the Defendant's behavior or demeanor to create any doubt as to whether the Defendant validly waived his *Miranda* Rights. The opinion of the EMTs that the Defendant was alert and aware of his surroundings combined with the opinion of Officer Burton that the Defendant understood his rights indicates that the Defendant was sufficiently alert to understand the rights he waived, and that he did in fact knowingly waive those rights. The Defendant, furthermore, had

substantial prior experience with the criminal justice system. His experience in dealing with seven

prior arrests strongly suggests that he understood the nature of his *Miranda* Rights when he waived

them. Moreover, the absence of police overreaching in obtaining the Defendant's *Miranda* waiver is

dispositive of the issue.

There was testimony by the Defendant's mother that the Defendant did not "appear to be

himself" when Officer Burton was placing the Defendant into the police vehicle. T.83. She did not

testify that the Defendant appeared to be having another headache or otherwise be in pain.

Moreover, one would expect that the Defendant's customary demeanor would be altered somewhat

after being arrest on 3 outstanding warrants, handcuffed, and placed in a police patrol. Additionally,

the Defendant's mother was not a witness to the Defendant's behavior at the police station. Her

testimony warrants little weight.

A nurse at Gander Hill Prison ("the nurse") also testified for the defense. On direct

examination she said the Defendant "seemed to be very nervous, very anxious." T. 87. This is not a

remarkable assessment of a man recently arrested on multiple charges, including serious gun and

drug charges, and detained in prison. On cross-examination the nurse testified that the Defendant

was able to provide her accurate medical information and at no time expressed confusion. T. 91.

The only statement of the Defendant that did not make sense to the nurse was the Defendant's report

of a sensation, of feeling "some flame." T. 91. On redirect examination she said the Defendant did

not appear to be disoriented or incoherent, she merely said he was "agitated." T. 92.

The nurse's testimony is insignificant to the relevant issue before the Court. She observed

nothing remarkable about the Defendant and only observed him one time, at 4:55 P.M., some seven

hours after the Defendant's post-arrest interview at the police station.

In summary, the Defendant voluntarily, knowingly, and intelligently waived his *Miranda* Rights.

### The Incriminating Statements

"[C]oercive police activity is a necessary predicate" to finding a confession not voluntary. *Connelly*, 479 U.S. at 167.

An inquiry into the voluntariness of a confession must be done in light of the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973). Factors to be considered include the defendant's age, education, and intelligence. Also considered is any advice of rights, the length of detention, any repeated or prolonged questioning, and any use of physical punishment such as deprivation of sleep or food. *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir 1986). A defendant's mental health and drug use also are relevant. Further, a defendant's prior dealings with the criminal justice system weigh in favor of the voluntariness of his confession. *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005). .

A valid *Miranda* Waiver strongly suggests that a subsequent confession was voluntary. *Seibert*, 542 U.S. at 608-09; *Berkemer v. McCarty*, 468 U.S. 420, 433 & n.20 (1984).

The government bears the burden of proving the voluntariness of a confession by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *Seibert*, 542 U.S. at 609 n.1 (citations omitted).

The Defendant's incriminating statements made to Officer Burton at the Wilmington Police Station were made voluntarily. At 20 years of age the Defendant is an adult. The records reflects no impairment in the Defendant's inherent intelligence. His history of numerous prior arrests demonstrates a familiarity with the criminal justice system. He was provided *Miranda* warnings and

made an express waiver. The Defendant was detained less than one hour before he made his brief statement in response to brief questioning. The Defendant made no complaints of pain or discomfort. Officer Burton did not observe anything about the Defendant's behavior or demeanor that caused the officer to question the voluntariness of the Defendant's post-arrest statement. The Defendant recently had a seizure, however, he had sufficiently recovered from its effects by the time he gave his *Miranda* waiver and made his statement. There is no evidence that the Defendant was under the influence of alcohol or drugs at the relevant time. Thus, an assessment of the Defendant's state of mind during the relevant period of time warrants a finding that his post-arrest statement was given voluntarily.

Lastly, the record demonstrates that there was no coercive police action used in securing the Defendant's incriminating statements. Neither Officer Burton nor anyone else threatened or intimidated the Defendant or promised him anything in order to secure his incriminating statement. No one took any physically or psychologically coercive action against the Defendant. Given that coercive police activity is a *sine qua non* of an involuntary confession, the Defendant's incriminating statements must be considered voluntary.

### Conclusion

The items found in the search and the above referenced incriminating statements made by the

13

Defendant are admissible.

COLM F. CONNOLLY
United States Attorney

BY: _____
Edmond Falgowski
Assistant United States Attorney

Dated:    August 2, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Criminal Action No. 07-19 (JJF) |
| | : | |
| MARIO WOODING, | : | |
| | : | |
| Defendant. | : | |

### AFFIDAVIT OF SERVICE

I, Kathie Gray, an employee in the Office of the United States Attorney for the District of Delaware, hereby attest under penalty of perjury, that on August 2, 2007, I electronically filed the foregoing **GOVERNMENT'S PROPOSED STATEMENT OF FACTS AND CONCLUSIONS OF LAW** with the Clerk of Court using ECF which will send notification of such filing(s) to the following:

Edson A. Bostic, Esquire
Federal Public Defender's Office
First Federal Plaza, Suite 110
704 King Street
Wilmington, DE 19801
(302) 573-6010
ecf_de@msn.com


*/s/ Kathie Gray*

_____
Kathie Gray, Legal Assistant