IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 07-19-JJF |
| | : | |
| MARIO WOODING, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS**

Defendant, Mario Wooding, by and through his undersigned counsel, Edson A. Bostic, Federal Public Defender for the District of Delaware, respectfully submits this Memorandum of Law in support of his Motion To Suppress Physical Evidence And Statements. For the reasons set forth below, Mr. Wooding seeks to exclude the government's admission, at trial, any and all statements that were obtained in violation of his Fifth Amendment rights.

**I. INTRODUCTION**

On February 6, 2007, Mr. Wooding was indicted for knowingly possessing a mixture of heroin, a controlled substance, with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)©, knowingly possessing a firearm in furtherance of drug trafficking to wit, possession of heroin with the intent to distribute it, in violation of 18 U.S.C. § 942(c)(1) and (b)(1)©, and knowingly possessing a firearm that has been transported in interstate commerce to Delaware, in violation of 18 U.S.C. §§ 922(g)(1) and 924 (a) (2). On April 16, 2007, Mr. Wooding filed a Motion to Suppress Physical Evidence and Statements. The grounds for Mr. Wooding's motion related to

his seizure on or about January 8, 2007, and statements made to law enforcement officers. On June 14, 2007, this Court conducted an Evidentiary Hearing to determine Mr. Wooding's suppression motion.

Mr. Wooding challenges the admission of his statements, and submits that law enforcement officers obtained his statements in violation of his Fifth Amendment rights. Thus, Mr. Wooding's statements must be suppressed and excluded at trial.

## II. FACTUAL BACKGROUND

### A. Investigative Report Summary

On January 8, 2007, Wilmington paramedics responded to an emergency phone call at the home of Mr. Wooding's girlfriend. Officer Daniel Burton, a patrolman with the Wilmington Police Department, also responded to the call.

Officer Burton arrived at the scene and saw medical services attending to Mr. Wooding, who was incoherent and lying on the ground. The paramedics "asked [Mr. Wooding] his name several times, but met with negative results." According to Officer Burton, the paramedics located Mr. Wooding's pants and boots in an attempt to find his identification.

One of the paramedics searched inside of Mr. Wooding's pants and boots and found 19 small plastic bags containing a white, powder-like substance, a semi-automatic handgun, a magazine containing six rounds and three loose rounds. Officer Burton secured these items and subsequently discovered that Mr. Wooding had three outstanding warrants.

The paramedics informed Officer Burton that Mr. Wooding did not require further medical attention. At this time, Officer Burton arrested Mr. Wooding and transported him to the police

station.

Officer Burton alleges that after he administered Mr. Wooding's Miranda rights, he allegedly stated that the drugs and handgun belonged to him, and that he was a drug dealer. Officer Burton then field tested the white, powder-like substance contained in the confiscated bags, which tested positive for heroin.

### B. June 14, 2007 Evidentiary Hearing[1]

At the Evidentiary Hearing, the government presented: (1) Donald Moore, Emergency Medical Services Technician ("EMT"); and (2) Patrolman Daniel Burton. Mr. Wooding presented the testimony of: (1) Elizabeth Morales, his mother; and (2) Diana Nakiriyan, a licensed nurse at Gander Hill Prison.

#### 1. Donald Moore's Testimony

Mr. Moore testified that he responded to 320 East 10th Street because of an unknown medical problem at the residence. (Tr. 6-7). Mr. Moore testified that Officer Burton also arrived at the scene. (Tr. 7).

Mr. Moore testified that upon arrival, the EMTs found Mr. Wooding "laying on the floor on a sheet that was over top of what we found to be a piece of foam." (Tr. 11). Mr. Moore testified that Mr. Wooding only wore a pair of boxers and T-shirt, and that the EMTs "weren't getting any response from him. His eyes were open and he was looking around but he was not answering any questions." (Tr. 13-14).

---

[1] Because Mr. Wooding challenges only the Miranda issue, he recounts only those portions of the evidentiary hearing testimony that are relevant to the Court's determination of this issue. While Defendant's written motion also challenged the seizure of the physical evidence, based upon the testimony and relevant case law, Defendant does now (exigent/circumstance doctrine) further press that issue. See United States v. Quarles, 467 U.S. 649 (1984).

Mr. Moore testified that the EMTs assessed Mr. Wooding's vital signs and complete mental state and "believed . . . him to be in a postictal state where his eyes were open and he's looking around at things[,] but he's not alert to what is going on. He [was] unable to answer questions or comprehend when you're talking to him." (Tr. 14). Mr. Moore further explained that a postictal state "generally happens when people have seizures[,] and they enter into a state where their mental status is altered due to lack of oxygen to the brain . . . They are unaware of what is going on in their surroundings." (Tr. 14-15).

Mr. Moore testified that the EMTs placed Mr. Wooding on oxygen and asked a woman that was standing outside of the door if "anybody knew anything about him" and his medical history, but received no response. (Tr. 15). Mr. Moore testified that the EMTs subsequently looked for information regarding Mr. Wooding's condition, and found a cell phone, handgun and what appeared to be heroin. (Tr. 16-17). Mr. Moore testified that the EMTs did not know Mr. Wooding's medical history, but remembered "somebody saying . . . that he was in the hospital the night before for a seizure." (Tr. 19.) Mr. Moore testified that the EMTs believed Mr. Wooding had a seizure. (Tr. 19).

Mr. Moore testified that Mr. Wooding started to become alert, and that his EMT partner learned from Mr. Wooding's mother that he had been in the hospital on the previous night because he had a seizure that resulted from abuse of cough syrup. (Tr. 21). Mr. Moore testified that Mr. Wooding was "fully alert," and refused to be transported to the hospital, and that the EMTs concluded that he was alert enough to determine that he did not need medical attention. (Tr. 22-23). The EMTs left Mr. Wooding at the residence. (Tr. 24). On cross-examination, Mr. Moore testified that it took approximately 10 to 13 minutes for Mr. Wooding to become lucid and inform the EMTs

4

that he did not want medical attention. (Tr. 41).

### 2. **Patrolman Daniel Burton's Testimony**

Officer Burton testified that "when the EMTs attempted to identify [Mr. Wooding] and they weren't getting any response, . . . that's when I asked [questions] and he was unresponsive to me." (Tr. 49). Officer Burton testified that after the EMTs left the residence, he placed Mr. Wooding into custody and transported him to the police station. (Tr. 52.).

Officer Burton testified that Mr. Wooding did not resist arrest, and was very calm. (Tr. 52). Officer Burton testified that he transported Mr. Wooding to the police station, where he took him in the turn key, put him in the interview room, collected his property and read his Miranda rights from a card. (Tr. 53). Officer Burton testified that Mr. Wooding was attentive and agreed to voluntarily answer questions. (Tr. 54-55).

Officer Burton stated that Mr. Wooding said that the seized drugs were his, that he sells them, and that he used the gun for protection. (Tr. 55). Officer Burton testified that after he read the Miranda warnings, Mr. Wooding made a statement in a matter of minutes during the five to seven minute conversation. (Tr. 55). Officer Burton testified that Mr. Wooding was coherent. (Tr. 56-57).

On cross-examination, Officer Burton testified that he allowed Mr. Wooding's mother, who had arrived at the scene, to speak to Mr. Wooding for approximately one minute. (Tr. 58-59). Officer Burton testified that there was a video of Mr. Wooding in the interview room, and defense counsel requested that the government produce this tape. (Tr. 65). Officer Burton testified that Mr. Wooding was neither given a written Miranda statement to review, nor provided food, water or medication prior to the interrogation. (Tr. 66).

### 3. **Elizabeth Morales' Testimony**

Ms. Morales, Mr. Wooding's mother, testified that on January 7, 2007, she took him to the hospital because he complained of having migraines. (Tr. 73-74). Ms. Morales testified that she was in the room with him as he was being examined, and that he "seemed like he was off somewhere . . . he was just not there." (Tr. 75-76). Ms. Morales testified that she tried to get him to focus on a "TV in the lobby and he wouldn't focus on that. He was just staring at the floor more or less of the time." (Tr. 76).

Ms. Morales testified that the next morning, she received three phone calls from Mr. Wooding's girlfriend, who relayed what Mr. Wooding was going through, asked about Mr. Wooding's medical conditions and informed her that "they had found a gun or drugs . . . ." (Tr. 77-80). Ms. Morales arrived at the scene and saw Mr. Wooding inside of the residence at 320 East 10th Street. (Tr. 81). Ms. Morales testified that Mr. Wooding "was sitting on the floor in a daze with tubes up his nose." (Tr. 81). Ms. Morales testified that she was there for five minutes before he was removed by the police. (Tr. 82). Ms. Morales testified that Officer Burton allowed her to speak to Mr. Wooding, and that he did not appear to be himself. (Tr. 82-83).

### 4. **Diana Nakirigan's Testimony**

Ms. Nakirigan, a licensed nurse at Gander Hill Prison, testified that she remembered Mr. Wooding coming in, and that he seemed to be nervous and anxious. (Tr. 87). Ms. Nakirigan testified that:

> [A]ccording to the way he looked[,] his eyes were wide open and pinpointed[,] and he seemed to have a kind of mental problem. I asked him whether he had any mental problems and he said he's had a seizure. And he said he felt like he was going to have a seizure at that particular time. And what [sic] he stated he said he felt like his eyes are being fluttered[,] and I didn't understand what he meant by that but I figured it

6

meant he was having a blackout.

(Tr. 87-88).

Ms. Nakirigan testified that she contacted a physician, who advised her to give him Elavil, and that Mr. Wooding was referred to the infirmary for observations for the next 24 hours. (Tr. 89). Ms. Nakirigan also testified that Mr. Wooding's body looked normal, but his skin appeared clammy and was warm to the touch. (Tr. 90). On cross-examination, Ms. Nakirigan testified that Mr. Wooding knew where he was, but "some things he was saying didn't make sense." (Tr. 91).

### III. ARGUMENT

The Fifth Amendment of the United States Constitution protects a citizen from being "compelled in any criminal case to be a witness against himself." US CONST. Amend. V. In Miranda v. Washington, 384 U.S. 436 (1966), the Supreme Court determined that a defendant may waive his or her Fifth Amendment rights against self-incrimination only if "the waiver is made voluntarily, knowingly and intelligently." Id.; see also, Frazier v. Cupp, 394 U.S. 731, 739 (1969) (stating that courts must examine the totality of the circumstances to determine the voluntariness of self-incriminating statements).

In United States v. Pruden, No. CR.A. 02-142-JJF, 2003 WL 21383693 (D.Del. June 10, 2003), this Court stated:

> It is the Government's burden, in accord with Miranda and its progeny, to prove that a waiver of rights was both voluntary and knowing and intelligent. First, the statements must be given voluntarily in the sense that it was the product of a free and deliberate choice rather than the result of intimidation, coercion or deception. Second, the waiver must be knowing and intelligent in the sense that it is made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

Id., citing United States v. Durham, 741 F.Supp. 498, 502 (D.Del. 1990). The government must

prove a defendant's waiver of his or her <u>Miranda</u> rights by a preponderance of the evidence. <u>Pruden</u>, 2003 WL 21383693, at *4, citing <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986).

In <u>Pruden</u>, the Court further explained:

> In conducting an analysis of the totality of the circumstances, courts should look to factors such as 'the tactics used by police, the details of the interrogation, and any characteristics of the accused that might cause his will to easily be overborne' . . . Further, a court should look to the particular facts of a given case, including the defendant's background experience and conduct.

<u>Id.</u>, (quoting <u>United States v. Palmer</u>, 203 F.3d 55, 60 (3d Cir. 2000)), and citing <u>United States v. Velasquez</u>, 885 F.2d 1076, 1086 (3d Cir. 1989). Mr. Wooding submits that he did not voluntarily, knowingly or intelligently waive his <u>Miranda</u> rights.

Although the government argues that Mr. Wooding's prior experience with the criminal justice system and express waiver "is strong proof of his waiver's validity," Mr. Wooding contends that the record clearly demonstrates that he did not voluntarily, knowingly or intelligently waive his <u>Miranda</u> rights.

Mr. Wooding suffered a seizure on the night before, and day of, his arrest. Despite his refusal to go to the hospital and clearance by the EMTs, the record demonstrates that the arresting officer had knowledge of Mr. Woodings' prior and ongoing medical condition, and did not provide him with a written <u>Miranda</u> statement in light of his medical condition. Moreover, the officer had a clear opportunity of recording an audio statement by requesting that the turn key officer in the cell block start the audio to go with the video equipment, which according to the officer, captured the visual interrogation of defendant. (Tr. 63). That simple request, if made would have been dispositive of whether: 1) the officer gave defendant his <u>Miranda</u> warnings; 2) whether Mr. Wooding understood and voluntarily waived those rights; and 3) whether he was lucid and coherent at the time the alleged

statement was made. The officer's failure to request that the audio be turned on, therefore, should impact heavily on whether the government has sustained its burden of proving the voluntariness of defendants' statements.

     Ms. Nakirigan's testimony indicates that Mr. Wooding was still suffering from the effects of his seizure, which resulted in his placement in the prison infirmary for 24 hour medical observation. Ms. Nakirigan also testified that Mr. Wooding said things that did not make sense. Thus, Mr. Wooding could not have voluntarily, knowingly, or intelligently waived his Miranda warnings where his ongoing illness caused his will to easily be overborne, and he was not fully aware that he was abandoning his Miranda rights.

**IV.  CONCLUSION**

  For the foregoing reasons, the Court should exclude the government's admission, at trial, of any and all statements that were obtained in violation of Mr. Wooding's Fifth Amendment rights.

                Respectfully submitted,

                 /s/ Edson A. Bostic
                Edson A. Bostic, Esquire
                Federal Public Defender

                Tieffa N. Harper
                Research & Writing Attorney

                Attorneys for Mario Wooding

Federal Public Defender's Office
District of Delaware
704 King Street, Suite 110
Wilmington, Delaware  19801
(302) 573-6010
Email:ecf_de@msn.com

Dated: August 10, 2007